**Opinion issued March 8, 2016**



In The

# Court of Appeals

For The

# First District of Texas

————————————

## NO. 01-15-00845-CV

————————————

## IN THE INTEREST OF D.L.T., D.L., D.L., T.L., D.W. AKA D.T.W., AND D.W., CHILDREN

---

**On Appeal from the 314th District Court**
**Harris County, Texas**
**Trial Court Case No. 2014-03436J**

---

## MEMORANDUM OPINION

This is an appeal from a judgment terminating Mother's parental rights to her six minor children[1] and appointing the Department of Family and Protective Services as Managing Conservator. We affirm.

---

[1]   Because some of the children share the same initials, we refer to them by pseudonyms, from oldest to youngest, Joe, John, Jane, Joan, Ann and Dee.

# BACKGROUND

## A.    Trial Testimony

Mother came to the Department's latest attention on June 12, 2014, three months after her youngest daughter Dee was born.[2]   Mother stipulated at trial that Dr. Rebecca Girardet was an expert in child-abuse forensics.  Girardet testified that Dee weighed just under six pounds (2.86 kilos) when she was born, in about the 25th percentile range of children.  When Dee was brought to the hospital three months later, on June 11, 2014, she weighed 7.91 pounds (3.59 kilos), placing her "well below the 3rd percentile."

Mother reported to the doctors that she was mixing Dee's formula correctly and feeding her 4 ounces of formula 6 times each day.  Girardet opined that Dee would not have dropped as much weight as she did if she were actually fed as Mother claimed.  She based that opinion on the fact that the hospital could not find any underlying medical explanation for the lack of weight gain, and that, after being admitted to the hospital, Dee immediately gained weight at a normal rate on the same calorie formula Mother claimed to be feeding her.  When Dee was discharged from the hospital on June 18, she weighed 3.7 kilos, representing an average weight gain of one once per day during her hospitalization, which is

---

[2]    The family had been the subject of investigation by the Department three other times since October 2002.

normal weight gain for a baby her age. When the doctor saw Dee ten days later, she had gained an average of three ounces a day since her discharge from the hospital.

Girardet opined that, during Dee's first three months of life, Mother was not adequately feeding her, and that caused a failure to thrive. When interviewed at the hospital, Mother indicated that she knew the amount Dee was supposed to be fed, and indicated that she knew how to feed her. She told the doctor that she had taken Dee to the WIC office a few days before bringing her to the hospital, and the WIC office staff told her to take Dee to the pediatrician immediately because of her weight. Mother told the doctor that she did not take Dee to the pediatrician because "she was having trouble with her apartment and it needed to be inspected." Girardet testified that was the only explanation Mother gave at the hospital for Dee's failure to thrive.

Girardet agreed that spitting up or a stomach virus could impact a baby's weight gain, but she ruled out both of those causes in this case because Dee did not show a pattern of spitting up during her hospital stay, and a stomach virus would not have lasted three months. She testified that the medical team at the hospital concluded that Dee's failure to thrive was "the result of nutritional neglect." The medical notes from the hospital visit also indicated the emergency room admitting

3

doctor's concern that the Dee "was dirty, covered in feces, and wearing soiled clothing."

Dr. Paul Damin testified to doing a complete psychological evaluation on Mother, and as to his findings:

> The overall findings were low average intellectual functioning, reading skills that were low but . . . sufficient to read self report measures. Emotional functioning that showed that she was somewhat defensive putting forth a positive impression, but overall, the results suggested that she experiences some anxiety problems, coping with anxiety and managing it. Some difficulties with exercising excessive control over others in relationships and is prone to be hostile, edgy in her interactions with others. As well as some parenting concerns that indicated some rigid beliefs and behaviors, low impact awareness of children's needs and limited understanding of normal child development.

Damin testified that he did not find any mental illness that inhibited Mother's ability to parent her children. He opined that Mother has "the mental capacity to fully be consciously aware of her actions and the consequences that would follow." He also opined that Mother had the mental capacity to understand the importance of feeding her children and how to do it correctly. He reported that the risk of Mother "engaging in intentionally abusive behavior appears to be minimal."

At the conclusion of Damin's evaluation, he recommended some "extended intervention." Mother reported that she had completed a parenting class, but Damin believed there were still some risk factors calling for additional parenting

4

training. He also wanted her to consider a literacy program that might help improve her reading skills and help with passing her GED. He opined that Mother's low functioning ability was not low enough to contribute to the issues before the court on termination.

Stephanie Harris, Mother's therapist, testified that she had seventeen sessions with Mother between January 20, 2015 and May 29, 2015. Harris identified Mother's goals during that period as "to achieve personal stability to create an appropriate environment for her children, improve her personal accountability and insight, increase autonomy, stability, independence and improve ability to meet each child's individualized needs."

Harris testified that the only goal Mother met was "improving her own personal accountability insight." Harris opined that Mother had not successfully completed her individual therapy, and she stated that she could not make a recommendation either way about whether the children should be reunited with Mother.

Mother testified that she had been working since November 2014 cleaning office buildings. That was her first job since 2002. She cared for her children through Texas Temporary Assistance for Needy Families (TANF), food stamps, and Women, Infants and Children (WIC). She met Andrew London (Jane's father), when Joe was a year old. London has provided financial support to her

since then from his income fixing vehicles and, later, through his receipt of Social Security disability benefits.

Mother testified to attending school at one point to earn a certification as a medical assistant, but she dropped out when she was pregnant with one of her girls because she was sick a lot. Mother stated that she fed her children with food stamps so that "every day they had a meal." The school reported to Mother that her children often came back for seconds when eating at school. She did not take that as an indication that they did not get enough to eat, because often at home her kids would request seconds when she cooked meals. Mother first learned "through the paperwork" at the beginning of the Department's current investigation that the schools reported that the children were coming to school hungry.

Mother stated that she started off breastfeeding Dee, but switched to formula when Dee was not getting enough breast milk. She fed Dee formula "every time she hollered." She got her formula through WIC and, if she ran out, she used her food stamps for formula. She explained that she knew how to properly mix the formula.

Nancy Bilderback, a Child Advocate, testified that she had been assigned Mother's case in October of 2014 and explained the children's current placements. The youngest two children—Ann and Dee—were placed with their paternal grandmother, who wished to adopt them. The two middle girls—Jane and Joan—

6

were placed with Joan's adult sister, Ms. Adams, who wished to adopt them. The two oldest children, Joe and John, were back in foster care. They were placed together in a home with a foster mother. Bilderback testified that she believed it was in the children's best interest for Mother's parental rights to be terminated so adoptions could be facilitated.

When Bilderback visited Mother's apartment in January 2015, "the home was infested with cockroaches. It was dirty. Floor was sticky." Because Mother works as a janitor for office buildings, Bilderback viewed Mother's failure to clean her apartment as an example of something that Mother knew how to do properly, but chose not to.

Bilderback testified that there were other things that Mother had committed to do but had not followed through on, including getting a gold card for medical coverage and her GED. "She started, stopped, and didn't go back." She testified that many resources had been extended to Mother and no explanations provided about why she had not followed through.

Binderback interviewed Mother's family members, who told her they were very concerned about Mother's care of the children, even before the Department got involved. For example, family members had to call Mother to remind her to do things like feed the children and pick them up from school. They would call to wake Mother up to make sure she got her children to school on time. For these

reasons, and because of the "deplorable condition of the home," Binderback believed that the children were better off with relatives.

Robyn Jones, a Child Protective Services (CPS) caseworker, also testified. She indicated that Mother completed her parenting classes in September 2014, but did not implement many of the lessons into her own life. She listed the reasons that CPS is seeking termination of Mother's parental rights as: (1) Mother lacks a clean, suitable, home environment, (2) Mother did not successfully complete her therapy, which was a requirement of her family services plan, and (3) Mother had more than one child who failed to thrive because Mother knowingly and consciously failed to adequately feed her children.

Jones stated that Mother did give her a certificate indicating that Mother had completed an eight-week parenting class. She explained that she periodically met with Mother to go over Mother's progress in her service plan. Jones believed that Mother "was going through the motions," but she did not "see a lot of effort" and did not see a lot of modification in Mother's behavior. When Jones would discuss with Mother her deficiencies and her compliance, "[a]t times she was upset, very hostile." Other times, "she just said she's trying, . . . doing the best that she can."

Mother exhibited the most hostility about CPS's request that she provide support for her children while they were in CPS care. Jones heard from the relatives keeping the children that Mother had only provided $25 here and there

over a period of a year and a half. Jones testified that Mother fell far short of providing necessities for the children.

The other part of the service plan in which Mother exhibited deficiencies was her obligation to maintain appropriate housing. She had a roof over her head, but it was very dirty and bug infested. The condition of her home caused CPS concern.

Finally, Mother did not maintain stable employment. Mother reported being in the hospital for a couple of months as a reason for failing to work. Jones testified that Mother's history of providing her paycheck stubs was spotty.

If CPS or the children's caregivers scheduled a formal visit, Mother would attend. But it was made clear to Mother that she could visit Jane, Joan, Ann, and Dee whenever she wanted, and she "never really made any effort to do so." Jones believes that Mother has a bond with all the children, because they respond favorably when they see her, and the oldest four (the verbal ones) want to tell her about what is going on in their lives when they see her.

Jones also described the special needs of the children. Joe, who is 12 years old, was also hospitalized as a baby for failure to thrive. He has been held back two grades and has "severe educational needs." He was called upon to be the caregiver for his younger siblings frequently at home, which was not good for him. John, his brother, is 9 years old, has also been held back in school, and has anger

issues and possibly ADHD. The boys are thriving in their foster home. Their foster mother has an educational specialist working with them, and she is making sure they are getting as much out of school as possible.

Jane and Joan are doing very well with their placement with Joan's older sister. Ann and Dee are also thriving with their grandmother.

## B.    The Judgment

The trial court entered judgment finding, by clear and convincing evidence, that termination of Mother's parental rights to all six children is in the children's best interest, and that the Department had proven three statutory grounds for termination by clear and convincing evidence under Texas Family Code sections 161.001(b)(1)(D) (conditions and surroundings), (b)(1)(E) (conduct), and (b)(1)(O) (failure to complete service plan).

The court's judgment named the Department as Sole Managing Conservator of the children. The judgment also (1) terminated the parental rights of C.W. (father of Ann and Dee) pursuant to a voluntary relinquishment, (2) terminated the parental rights of A.L. (John's father) pursuant to a voluntary relinquishment, (3) terminated the parental rights of P.J. and T.D. (alleged fathers of Joe and Joan) and any unknown fathers of Joe and Joan, and (4) appointed J.R. (Jane's father) as possessory conservator of Jane with rights to supervised visits and an obligation to pay child support for her care.

Mother timely brought this accelerated appeal.

## ISSUES ON APPEAL

Mother brings two issues on appeal:

1.   "The evidence was legally and factually insufficient to support termination of Appellant's parental rights under Texas Family Code Section 161(1)(E)."

2.   "The evidence was legally and factually insufficient to support the termination of Appellant's parental rights under Texas Family Code Section 161.001(2)."

## APPLICABLE LAW

Under section 161.001 of the Texas Family Code, the Department must establish two things to successfully terminate a parent's parental rights: (1) that one or more acts or omissions enumerated in one or more of the subsections of section 161.001(b)(1) occurred, *see* TEX. FAM. CODE ANN. § 161.001(b)(1) (West 2014); *In re J.L.*, 163 S.W.3d 79, 84 (Tex. 2005), and (2) that termination of the parent-child relationship is in the best interest of the child. *See* TEX. FAM. CODE ANN. § 161.001(b)(2); *J.L.*, 163 S.W.3d at 84. Termination may not be based solely on the best interest of the child. *Liu v. Dep't of Family & Protective Servs.*, 273 S.W.3d 785, 790 (Tex. App.—Houston [1st Dist.] 2008, no pet.).

The relevant sections of 161.001(b) that the trial court found in this case provide:

(b)   The court may order termination of the parent-child relationship if the court finds by clear and convincing evidence:

11

(1)     that the parent has:

. . . .

(D) knowingly placed or knowingly allowed the child to remain in conditions or surroundings which endanger the physical or emotional well-being of the child;

(E) engaged in conduct or knowingly placed the child with persons who engaged in conduct which endangers the physical or emotional well-being of the child;

. . . .

(O) failed to comply with the provisions of a court order that specifically established the actions necessary for the parent to obtain the return of the child who has been in the permanent or temporary managing conservatorship of the Department of Family and Protective Services for not less than nine months as a result of the child's removal from the parent under Chapter 262 for the abuse or neglect of the child;

. . . . and,

(2)     that termination is in the best interest of the child.

TEX. FAM. CODE ANN. § 161.001(b).

## STANDARD OF REVIEW

A parent's rights to the "companionship, care, custody, and management" of his or her children are constitutional interests "far more precious than any property right." *Santosky II v. Kramer*, 455 U.S. 745, 758–59, 102 S. Ct. 1388, 1397 (1982); *see In re M.S.*, 115 S.W.3d 534, 547 (Tex. 2003). A termination decree is complete, final, irrevocable, and divests for all time that natural right as well as all legal rights, privileges, duties, and powers with respect to each other except for the child's right to inherit. *Holick v. Smith*, 685 S.W.2d 18, 20 (Tex. 1985).

12

Termination proceedings should be strictly scrutinized, and the involuntary termination statutes should be strictly construed in favor of the parent. *Id.* However, "the rights of natural parents are not absolute" and "the rights of parenthood are accorded only to those fit to accept the accompanying responsibilities." *In re A.V.*, 113 S.W.3d 355, 361 (Tex. 2003). Recognizing that a parent may forfeit his or her parental rights by their acts or omissions, the primary focus of a termination suit is protection of the child's best interests. *Id.*

Proceedings to terminate parental rights under the Family Code require proof by clear and convincing evidence. TEX. FAM. CODE ANN. § 161.001(b); *In re J.O.A.*, 283 S.W.3d 336, 344 (Tex. 2009). Clear and convincing evidence is "proof that will produce in the mind of the trier of fact a firm belief or conviction as to the truth of the allegations sought to be established." *In re J.O.A.*, 283 S.W.3d at 344. When the legal sufficiency of the evidence is challenged, a court should look at all the evidence in the light most favorable to the finding to determine whether a reasonable trier of fact could have formed a firm belief or conviction that its finding was true. *Id.* To give appropriate deference to the factfinder's conclusions, looking at the evidence in the light most favorable to the judgment means that a reviewing court must assume that the factfinder resolved disputed facts in favor of its finding if a reasonable factfinder could do so. *Id.* A corollary to this requirement is that a court should disregard all evidence that a reasonable factfinder could have

disbelieved or found to have been incredible. *Id.* This does not mean that a court must disregard all evidence that does not support the finding. *Id.* Disregarding undisputed facts that do not support the finding could skew the analysis of whether there is clear and convincing evidence. *Id.* If, after conducting its legal sufficiency review of the record evidence, a court determines that no reasonable factfinder could form a firm belief or conviction that the matter that must be proven is true, then that court must conclude that the evidence is legally insufficient. *Id.* at 344–45.

When the factual sufficiency of the evidence is challenged, only then is disputed or conflicting evidence under review. *Id.* at 345. If, in light of the entire record, the disputed evidence that a reasonable factfinder could not have credited in favor of the finding is so significant that a factfinder could not reasonably have formed a firm belief or conviction, then the evidence is factually insufficient. *Id.*

## SECTION 161.001 GROUNDS

"Only one predicate finding under section 161.001(1) is necessary to support a judgment of termination when there is also a finding that termination is in the child's best interest." *A.V.*, 113 S.W.3d at 362. Here, Mother challenges only the trial court's finding under section 161.001(b)(1)(E). She has not challenged the trial court's findings that termination is supported under section 161.001(b)(1)(D) or section 161.001(b)(1)(O). Because these sections were unchallenged and can

14

support termination, we need not address Mother's arguments that there is legally and factually insufficient evidence to support termination under section 161.001(b)(1)(E). *See, e.g.*, *In re L.M.*, 104 S.W.3d 642, 647 (Tex. App.—Houston [1st Dist.] 2003, no pet.) ("The trial court found two statutory violations. Mitchell challenges only the abandonment claim, thus conceding the endangerment finding. . . . . Therefore, we need only determine if the evidence was legally and factually sufficient to support the best interest finding." (footnote omitted)); *In re K.W.*, 335 S.W.3d 767, 769 (Tex. App.—Texarkana 2011, no pet.) ("Because the trial court's finding with respect to Section 161.001(1)(M) was unchallenged, and can support the order of termination, it is unnecessary to review legal and factual sufficiency arguments as to the other grounds."); *In re S.N.*, 272 S.W.3d 45, 49 (Tex. App.—Waco 2008, no pet.) ("Here, because Nancy and Charles challenge only two of the court's four findings on predicate grounds for termination, we need not address their complaints regarding the sufficiency of the evidence to support the predicate grounds for termination."). We overrule Mother's first issue.

## BEST INTEREST

Mother also challenges the legal and factual sufficiency of the evidence to support the trial court's finding that termination of Mother's parental rights was in the best interest of the children under section 161.001(b)(2).

Mother argues that she "worked very hard during the pendency of this suit to obtain all of her accomplishments in order to not have her parental rights terminated." She asserts that she "regularly visited her children and participated appropriately with them," as well as "completed an 'eight week parenting class,' 'psychosocial assessment,' and 'psychological evaluation.'" She contends that these facts, together with the strong bond she has with her children, demonstrate that the evidence is legally and factually insufficient that termination of her parental rights is in the children's best interest.

In determining whether termination of the mother's parental rights was in the children's best interest, we consider numerous factors, with respect to each child, including (1) the child's desires, (2) the current and future physical and emotional needs of the child, (3) the current and future physical danger to the child, (4) the parental abilities of the person seeking custody, (5) whether programs are available to assist the person seeking custody in promoting the best interests of the child, (6) plans for the child by the person seeking custody, (7) stability of the home, (8) acts or omissions of the parent that may indicate that the parent-child relationship is not proper, and (9) any excuse for acts or omissions of the parent. *Holley v. Adams*, 544 S.W.2d 367, 371–72 (Tex. 1976). "There is no requirement that the Department prove all these factors as a condition precedent to parental termination, and the absence of evidence about some factors does not preclude a

16

factfinder from reasonably forming a strong conviction that termination is in the child's best interest." *In re A.C.*, 394 S.W.3d 633, 642 (Tex. App.—Houston [1st Dist.] 2012, no pet.) (citing *In re C.H.*, 89 S.W.3d 17, 27 (Tex. 2002)).

In addition, the *Holley* factors are not necessarily the only considerations relevant to determining the best interest of the child. "[T]he prompt and permanent placement of the child in a safe environment is presumed to be in the child's best interest." TEX. FAM. CODE ANN. § 263.307(a) (West 2008). "In determining whether a parent is willing and able to provide a safe environment, we consider several factors, including (1) the child's age and vulnerabilities; (2) developmental evaluations of the child's parents, other family members, and others who have access to the child's home; (3) whether there is a history of substance abuse by the child's family or others who have access to the child's home; (4) willingness and ability of the child's family to seek, accept, and complete counseling services and cooperate with agency supervision; (5) the willingness and ability of the child's family to effect positive changes within a reasonable period of time; and (6) whether the child's family demonstrates adequate parenting skills." *A.C.*, 394 S.W.3d at 642 (citing TEX. FAM. CODE ANN. § 263.307(b)). Evidence establishing predicate acts under section 161.001(b)(1) may also be relevant to determining the best interest of the child. *See C.H.*, 89 S.W.3d at 28.

17

We conclude that there is legally and factually sufficient clear and convincing evidence supporting the trial court's conclusion that termination of Mother's parental rights is in the children's best interest. "Termination of the parent-child relationship is not justified when the evidence shows merely that a parent's failure to provide a more desirable degree of care and support of the child is due solely to misfortune or the lack of intelligence or training, and not to indifference or malice." *Clark v. Dearen*, 715 S.W.2d 364, 367 (Tex. App.—Houston [1st Dist.] 1986, no writ). Here, however, Mother has demonstrated an ongoing pattern for more than a decade of failing to meet current and future physical and emotional needs of her children, despite knowing how to do so. Two of her children, her oldest and youngest, were hospitalized for failure to thrive after birth. There is testimony, however, that Mother knew how to mix and feed her young children the proper quantity of formula. There was evidence that all six children were hungry while in her care, with the school expressing concern that the school-aged children were coming to school hungry and not getting enough to eat at home. Family members had to call Mother to remind her to feed the children. In contrast, all of the children are currently in homes where their nutritional and medical needs are taken care of.

Mother's oldest two children have lagged significantly academically. Mother did not acknowledge or address this in her testimony. There was evidence,

18

however, that the boys' current foster mother is actively addressing their educational needs.

Mother was offered assistance in completing her parenting plan with clear goals, but she did not complete it satisfactorily. She also failed to provide a suitable home for the children, or demonstrate a willingness to provide for their care financially. Although she was given plenty of assistance and a reasonable amount of time to make positive changes, the evidence indicates that Mother still does not have adequate parenting skills.

All six children are thriving in their stable placements (each with at least one sibling), with commitments by caregivers to adopt four of the six children. TEX. FAM. CODE ANN. §263.307(a) ("[T]he the prompt and permanent placement of the child in a safe environment is presumed to be in the child's best interest."). Given Mother's unwillingness to provide a stable, clean, or suitable living environment for the children and her unwillingness to ensure that they are properly fed, clean, and educated, the trial court was presented with ample clear and convincing evidence that termination of Mother's parental rights was in the children's best interest. *E.g.*, *In re J.D.*, 436 S.W.3d 105, 119 (Tex. App.—Houston [14th Dist.] 2014, no pet.) ("A parent's inability to provide adequate care for her children, unstable lifestyle, lack of a home and income, lack of parenting skills, and poor judgment may be considered when looking at the children's best interest.").

While Mother points to favorable testimony that she took her required parenting classes, the evidence indicates that Mother did little to implement anything she learned in her classes into her life and that she failed to complete other parts of her service plan. Accordingly, Mother's completion of her parenting classes does not mean that there is insufficient evidence to demonstrate termination is in the children's best interest. *E.g.*, *In re D.M.*, 452 S.W.3d 462, 473 (Tex. App.—San Antonio 2014, no pet.) (recognizing that even "[c]ompletion of all [Mother] was asked to do by CPS, however, does not necessarily mean termination is not in the child's best interest."). Indeed, Mother's inability to demonstrate that she was developing skills to become an effective parent led CPS's caseworker to opine that termination of parental rights was in the children's best interest despite Mother's completing her parenting class.

The other evidence Mother points to as weighing against termination is that the six children are bonded with her, and that they enjoy visits with her. But evidence of bonding is not always "so significant that a fact finder could not reasonably have formed a firm belief or conviction that termination of the Mother's parental rights is in the Child's best interest." *J.D.*, 436 S.W.3d at 118. And, here, there is no evidence that the children's bond with Mother rose to a level of the children's desiring to live with her over their current placements. We thus conclude the fact that there is a bond between Mother and her children and they

enjoy visits does not outweigh the significant evidence supporting the finding that termination of Mother's parental rights was in the children's best interest, especially in light of the evidence that Mother did not take advantage of opportunities to visit the children when allowed. *In re D.W.*, 445 S.W.3d 913, 926 (Tex. App.—Dallas 2014, pet. denied) (recognizing that, especially when younger, less mature children are at issue, "evidence that a child loves a parent and enjoys visits is only marginally relevant to a best interest finding.").

We overrule Mother's second issue.

## CONCLUSION

We affirm the trial court's judgment.


Sherry Radack
Chief Justice

Panel consists of Chief Justice Radack and Justices Keyes and Higley.

21